FILED
IN OPEN COURT
OCT - 6 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

DAVID J. RUSH,

*Defendant.*

Case No. 1:26-CR- 185

STATEMENT OF FACTS

The United States and the defendant, DAVID J. RUSH (hereinafter, "RUSH" or "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. From at least in and around October 2025 through at least in and around May 2026, in the Eastern District of Virginia and elsewhere, RUSH did knowingly devise and intend to devise a scheme and artifice to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises. For the purpose of executing the scheme, RUSH knowingly caused interstate wire communications to be transmitted, including the wire communication charged in Count One of the Information.

## I. THE WIRE FRAUD SCHEME

### *Rush's Employment and Position*

2. At all times relevant to this Statement of Facts, RUSH was employed by a component of the United States Government ("Government Agency 1"), where he rose to senior executive-level positions. RUSH worked for Government Agency 1 in the Eastern District of Virginia and occupied a position of significant trust.

3. RUSH possessed a Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance and had access to highly classified information, sensitive government programs, and compartmented activities.

4. RUSH also had access to national defense information classified up to the TS/SCI level. Classified national security information could be further protected through SCI compartments to protect particularly sensitive intelligence sources and methods.

5. To obtain this TS/SCI clearance, RUSH had to undergo a background investigation and sign non-disclosure and user agreements outlining the potential consequences of mishandling classified national defense information.

6. The nature of RUSH's legitimate responsibilities required that certain aspects of his work be restricted to persons possessing the appropriate clearance, access, and need to know.

7. As part of his legitimate responsibilities, RUSH exercised substantial discretion concerning sensitive programs and the resources necessary to support them. Among other things, RUSH could identify and communicate operational requirements, approve government resources in support thereof, and provide direction to entities and individuals supporting Government Agency 1.

8. Government Agency 1 personnel responsible for contracting, budgeting, and other support functions relied on RUSH to exercise with integrity his discretion for legitimate governmental purposes and to provide accurate information concerning the purpose and validity of the requirements and expenditures he authorized. Because certain legitimate activities within RUSH's portfolio were highly classified and compartmented, RUSH took advantage of processes associated with these legitimate activities to artificially invoke "need to know" constraints that

limited the ability of personnel responsible for contracting and funding to independently verify the operational basis for the requirements identified by RUSH.

9. Contractors supporting Government Agency 1 understood RUSH to be a senior government official authorized to communicate legitimate government requirements within the scope of his responsibilities.

10. RUSH was required to exercise the authority entrusted to him in furtherance of authorized government purposes. RUSH was not authorized to use his position to cause government funds or resources to be expended for his personal benefit.

***Relevant Entities and Individuals***

11. "Company 1" was a company that contracted with the United States Government, including Government Agency 1, to provide services in support of government activities. During the relevant period, Company 1 supported activities for which RUSH exercised substantial responsibility and authority.

12. "Individual 1" was a senior executive of Company 1 who worked at an office in Loudoun County, Virginia, within the Eastern District of Virginia, and interacted with RUSH concerning certain transactions described below.

13. "Individual 2" was an employee of Company 1 who worked at an office in Loudoun County. At RUSH's direction, Individual 2 initiated, or caused the transmission of, wire transfers and transmitted, or caused the transmission of, purchase orders, invoices, and other electronic documentation relating to expenditures that RUSH represented were required for legitimate classified government activities.

14. "Company 2" was a company that provided services in support of United States government activities and, during the relevant period, served as a subcontractor to Company 1.

15. "Individual 3" was a senior executive of Company 2 who interacted directly with RUSH concerning certain transactions described below, including the acquisition and delivery of gold bars.

16. "Individual 4" was an independent subcontractor who had worked with RUSH on government-related matters for several years. As described below, RUSH directed Individual 4 to assist with the acquisition of luxury real estate and other property based upon RUSH's representations that the acquisitions were required for legitimate government purposes.

17. "Holding Company 1" was a limited liability company established by Individual 4 at RUSH's direction. Government-derived funds were transferred to a bank account held by Holding Company 1, which was used to receive and disburse funds associated with the fraudulent activities described below.

***The Scheme and Artifice to Defraud***

18. Beginning no later than in and around October 2025, RUSH used his government position and misrepresented the scope and purpose of his authority to cause substantial amounts of money to be transferred or expended, property to be acquired, and services to be provided based upon materially false and fraudulent representations concerning official government requirements that did not exist.

19. The object of the scheme and artifice was for RUSH to maximize his personal wealth and enrichment by using his positions within Government Agency 1 to amass personal property and assets purchased with United States government funds.

20. As part of the scheme, RUSH knowingly fabricated two separate purported government activities to justify the acquisition of assets for his personal benefit. First, RUSH fabricated a highly classified program to justify the acquisition of luxury real estate, which he then

intended to resell for personal profit. Second, RUSH fabricated a separate purported sensitive government activity to justify the acquisition of gold bars. Neither the program nor the separate sensitive activity existed, and RUSH was not authorized to acquire the assets as he claimed.

***The Fabricated Classified Program***

21. A Special Access Program ("SAP") is a program that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level. Access to a SAP is restricted to specifically authorized individuals with the appropriate clearance and need to know.

22. A "read-in" is the process through which an authorized individual is formally granted access to a SAP. A legitimate read-in may include security instructions regarding the handling and dissemination of protected information and the execution of a non-disclosure agreement.

23. As a principal means of executing the scheme, in and around the fall of 2025, RUSH falsely represented to certain individuals that expenditures he directed were required for a highly classified government program, referred to herein as SAP #1. The stated purpose of SAP #1 involved the purchase of real property in and around parts of Southern Florida.

24. SAP #1 was not a legitimate government program.

25. RUSH nevertheless purported to "read in" selected government contractors and subcontractors to SAP #1, thereby representing that they had been granted access to an actual classified government program.

26. Among those whom RUSH purported to "read in" were Individuals 1, 2, and 4. As part of these purported read-ins, RUSH directed at least one of the individuals to sign a non-

disclosure agreement and instructed all of them that information concerning SAP #1 was highly classified and could not be disclosed to persons who had not been read into the program.

27. RUSH thereby used the essential secrecy and need-to-know requirements associated with legitimate classified programs to discourage the individuals he deceived from exposing RUSH's false representations to routine administrative, contracting, or financial review.

28. RUSH further represented to Individuals 1, 2, and 4 that highly placed United States government officials knew about or authorized SAP #1's purported activities.

29. In fact, SAP #1 was not an authorized government program, and RUSH lacked authority to use United States government funds to acquire the South Florida real estate property for his own enrichment.

***Funding and Government Oversight***

30. RUSH routed funding to requirements that he had fabricated. RUSH personally identified and directed those requirements and exercised substantial influence over their approval and funding, effectively allowing him to serve as his own approving official for the expenditures. In doing so, RUSH caused Government Agency 1 personnel to approve and fund requirements without disclosing that the purported operational needs underlying those requirements did not exist and that RUSH intended the resulting money and property for his own benefit.

31. RUSH also invoked classification restrictions to discourage independent scrutiny within Government Agency 1. For example, when a Government Agency 1 contracting official questioned expenditures RUSH approved in connection with his fraudulent scheme, RUSH told the official, in substance, that the official did not have a "need to know" the information underlying the requirement. RUSH thereby invoked restrictions associated with legitimate classified

activities to prevent personnel responsible for government funds from learning the true basis for expenditures he was directing.

32. Separately, RUSH represented to Company 1, Company 2, Individual 4, and others that he was acting pursuant to legitimate United States Government authority and that the transactions he directed were for authorized government requirements.

33. Those representations caused contractors and others to provide money, property, and services they otherwise would not have provided. Among other things, RUSH represented that the United States Government required the acquisition of luxury real property in South Florida; that a classified government assignment required tens of millions of dollars in gold; and that private air travel was necessary for official government purposes.

34. For example, in and around January 2026, RUSH caused Company 1 to provide RUSH $45 million to satisfy a purported Government Agency 1 requirement, even though Government Agency 1 had not yet provided Company 1 with authorization to disburse funds for that requirement. Company 1's senior executive approved the advance funding because he trusted RUSH and believed RUSH's representations that the expenditure reflected a legitimate government requirement for which Company 1 ultimately would be reimbursed.

35. RUSH directly or indirectly obtained gross receipts in excess of $1,000,000 through the offense, and those gross receipts were derived from funds provided by a financial institution.

***Real Estate and Luxury Property***

36. RUSH falsely represented that SAP #1 required the acquisition of luxury real estate in South Florida for sensitive government purposes.

37. RUSH directed Individual 4 to establish Holding Company 1 and a corresponding bank account for use in connection with the purported SAP #1.

38. Individual 4 did so because he believed RUSH's false representation that Holding Company 1 was required for a legitimate classified United States government program.

39. At RUSH's direction, Holding Company 1 submitted invoices to Company 1 describing the product or service as "Consulting."

40. Between approximately November 2025 and March 2026, RUSH caused Company 1 to transfer approximately $145 million to Holding Company 1 in multiple financial transactions.

41. RUSH thereafter directed how those funds were to be used, including directing the acquisition, renovation, improvement, and contemplated resale of luxury real estate.

42. At RUSH's direction, Individual 4 caused entities to acquire the following properties:

| **Approx. Date** | **Property** | **Purchase Price** |
| --- | --- | --- |
| 12/2025 | Residence in Palm Beach | $21,900,000 |
| 12/2025 | Parcel of land in Palm Beach | $13,650,000 |
| 1/2026 | Residence in Palm Beach | $27,000,000 |
| 2/2026 | Parcel of land in Hobe Sound | $40,000,000 |

43. Approximately $105 million of the funds transferred to Holding Company 1 were expended to acquire the South Florida properties, purchase luxury vehicles (as further described below), and pay associated expenses, among other items. When RUSH's scheme was uncovered in May 2026, approximately $39 million remained in the Holding Company 1 account.

44. RUSH personally directed material aspects of the acquisitions and discussed the improvement and potential resale of the properties with Individual 4. In December 2025, for example, RUSH and Individual 4 discussed hiring a designer and purchasing approximately $40,000 in kitchen appliances for one property. In discussing a guesthouse, RUSH described it

as "super unique and cool," and questioned whether acquiring it would "hamstring us when we're selling."

45. In February 2026, RUSH and Individual 4 discussed the potential resale of one of the properties. When Individual 4 discussed a potential transaction producing approximately $15 million net, RUSH responded, in substance, that he was not letting the property go for less than $15 million net.

46. RUSH also caused funds associated with his purported requirements to be used to acquire luxury vehicles and watches, including a BMW Alpina XB7 vehicle costing approximately $172,232, and multiple luxury watches, four of which were purchased with Holding Company 1 funds for approximately $63,700.

***Acquisition of Gold Bars, Cash, and Other Luxury Goods***

47. As another means of executing the same scheme and maximizing his personal enrichment, RUSH caused tens of millions of dollars in United States government funds to be used to acquire hundreds of gold bars.

48. In or around November 2025, RUSH separately represented that a highly sensitive government assignment required the acquisition of substantial quantities of valuable assets. RUSH told Individual 3 that the purported activity permitted the use of gold, diamonds, or cryptocurrency and discussed those alternatives before directing Individual 3 to acquire gold.

49. RUSH represented that the assets were intended for approximately six individuals.

50. Based on RUSH's representations that the gold was an authorized government requirement, Company 2 acquired 298 gold bars at a cost to Government Agency 1 in the amount of approximately $46,361,721, based on the value of the gold at the time of purchase and associated fees.

51. Between in and around December 2025 and in and around February 2026, Individual 3 ultimately delivered all of the gold acquired pursuant to RUSH's directions to RUSH's office in Loudoun County, Virginia, transporting the bars in Pelican cases and placing them in a safe located there.

52. In and around March 2026, RUSH told Individual 3, in substance, that all of the gold had been delivered to the purported recipients. RUSH also conveyed that one of the purported recipients wanted to know whether the gold bars could be traced.

53. Individual 3 responded that the trace should have been stopped before Individual 3 obtained physical possession of the gold bars.

54. Individual 3 maintained an itemized record containing identifying information and serial numbers for the bars acquired and delivered.

55. RUSH also obtained United States and foreign currency by making false representations that the currency was required for official government purposes.

56. On or about May 19, 2026, the Federal Bureau of Investigation executed a court-authorized search warrant of RUSH's residence in the Eastern District of Virginia and recovered 298 gold bars. The serial numbers of the 298 gold bars recovered from RUSH's residence matched the serial numbers recorded by Individual 3 for the gold bars purchased pursuant to RUSH's directions. During the May 19 search, agents also recovered from RUSH's residence approximately $2,106,550 in United States currency, approximately €104,795, and over 30 watches, including multiple Rolexes.

57. Additionally, RUSH caused private air travel to be arranged and paid for based upon representations that the travel was connected to his official responsibilities. Between approximately September 10, 2024, and May 14, 2026, RUSH authorized dozens of privately

chartered flights in connection with travel that primarily involved Palm Beach, Florida, at a total cost of approximately $1,818,487. According to Government Agency 1, RUSH did not have a legitimate official requirement for his travel to Palm Beach, Florida, all of which was paid for by the U.S. Government.

58. For example, on at least one trip, RUSH traveled to Palm Beach on a private aircraft with a family member and no other passenger. The charter company estimated the approximate round-trip cost of that travel at $95,000.

59. RUSH executed the scheme through interstate wire communications, including electronic communications and transfers of funds through the interstate banking system.

60. On or about January 23, 2026, for the purpose of executing the scheme, RUSH knowingly caused Individual 2, from a computer in the Eastern District of Virginia, to initiate an interstate wire transfer of approximately $45 million from Company 1's financial institution to Holding Company 1. RUSH falsely represented to Individual 2 the material fact that the funds were needed to purchase real estate in support of SAP #1, when RUSH knew then that SAP #1 was not a legitimate government program, and he did not have authorization to approve the expenditure. This wire transfer was started from a location within the Eastern District of Virginia and traveled to a server located outside of the Commonwealth of Virginia and was made in furtherance of the fraud scheme described above.

## II. FALSE BACKGROUND REPRESENTATIONS AND TIMECARD FRAUD

61. Before and during the conduct described above, RUSH made false representations concerning aspects of his educational, professional, and military background that contributed to his obtaining positions of government responsibility.

62. From the beginning of his employment at Government Agency 1, RUSH presented himself to colleagues and contractors as a combat veteran with academic credentials.

63. Among RUSH's claims were assertions that he was a military pilot who held a bachelor's degree from a large public research university located in South Carolina and a doctoral degree from a private research university in New York.

64. These and other representations concerning RUSH's military and academic accomplishments were false. In reality, RUSH did not graduate from these universities and was never a pilot in the U.S. military.

65. RUSH served in the United States Navy and was honorably discharged from the reserves effective February 1, 2015.

66. After February 1, 2015, RUSH was no longer serving in the military.

67. Nevertheless, during the five-year period beginning on or about July 27, 2021, RUSH claimed approximately 392 hours of military leave on time-and-attendance records associated with his civilian United States government employment.

## III. UNAUTHORIZED DISCLOSURE OF NATIONAL DEFENSE INFORMATION

68. The United States Government entrusted RUSH with access to sensitive government information, including classified information relating to the national defense that was closely held by the government.

69. As a result of his training and review and signature of non-disclosure agreements, RUSH knew that classified information at any level could only be lawfully accessed by persons determined by an appropriate U.S. government official to be eligible for access to classified information, who received a security clearance, who had signed an approved non-disclosure agreement, and who had a "need to know" the classified information.

70. Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information classified as "Top Secret" was information owned by, produced by, produced for, and under the control of the United States Government, the unauthorized disclosure of which, by definition, reasonably could be expected to cause exceptionally grave damage to the national security of the United States.

71. In and around late 2025, RUSH knowingly communicated, delivered, or transmitted classified national defense information at the Top-Secret level to a foreign government official who was not authorized to receive it and had no need to know it. Specifically, RUSH revealed to a foreign government official the existence and certain descriptive information of a U.S. government clandestine human source. The disclosure of such information could endanger the safety and life of the human source and the U.S. government officers working with the source and jeopardize the U.S. government's ability to recruit human sources, who rely on the U.S. government's assurance of absolute secrecy.

72. On or about April 28, 2026, while being interviewed by Government Agency 1, RUSH admitted that he provided the foreign government official information concerning the human source.

* * *

73. As a result of the scheme, RUSH caused approximately $193,590,400 in loss through the transfer or expenditure of U.S. government funds and the acquisition of property and services based upon his materially false representations concerning official government requirements.

74. RUSH acted knowingly and with the intent to defraud.

75. This Statement of Facts sets forth facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

76. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

TODD W. BLANCHE
Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

Date: October 6, 2026

By: ______________________
Raizza K. Ty
Gavin R. Tisdale
Assistant United States Attorneys

JOHN A. EISENBERG
Assistant Attorney General for National Security

By: ______________________
Kevin Hakala
Kathryn DeMarco
Trial Attorneys
U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, DAVID J. RUSH, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

DAVID J. RUSH

I am Jessica N. Carmichael, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Jessica N. Carmichael, Esq.
Attorney for DAVID J. RUSH